UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AUSTIN CLARK,

       Plaintiff,                                            Hon. Janet T. Neff

v.                                                               Case No. 1:13-CV-550

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits and Supplemental Security Income benefits under Titles II and XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security

case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 10 years of age on his alleged disability onset date. (Tr. 23-25). He successfully completed high school, but has no past relevant work experience. (Tr. 30). Plaintiff applied for benefits on August 5, 2009, alleging that he had been disabled since November 1, 2001, due to ADHD, depression, anger problems, and mood swings. (Tr. 23, 168). Plaintiff's applications were denied, after which time he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 61-136). On July 18, 2011, Plaintiff appeared before ALJ Deborah Rose with testimony being offered by Plaintiff, Plaintiff's father, and a vocational expert. (Tr. 36-60). In a written decision dated November 16, 2011, the ALJ determined that Plaintiff was not disabled. (Tr. 23-31). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-6). Plaintiff subsequently initiated this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

On May 21, 2003, Social Worker Allene Tucker completed a School Social Work Report in which she concluded as follows:

> Austin continues to have a great deal of difficulty with his temper and frustration level. He is easily angered and can be threatening verbally and physically. There is depression in Austin's family history and his behavior is not unlike that of a depressed adolescent. Mrs. Clark reports that he has been diagnosed with Oppositional Defiant Disorder. This might rule out emotionally (sic) impairment except that Austin appears to regret his misbehavior. By Mrs. Hodgman's rating on the Achenbach, Austin's Internalizing and Externalizing scores were both in the significant range, though the Externalizing score was much higher. Mrs. Clark showed significant concern on

> the Internalizing score, but only borderline concern on the Externalizing score.
>
> Austin's need for special education support academically and emotionally remains. His eligibility as emotionally impaired should be considered at the MET.

(Tr. 224-26).

On January 10, 2006, Plaintiff was examined by Patricia Decker, Ph.D. (Tr. 220-23). Plaintiff participated in cognitive testing the results of which revealed that he possessed a verbal IQ of 84, a performance IQ of 82, and a full scale IQ of 82, all of which were characterized as "low average." (Tr. 220). Plaintiff also was administered the Woodcock-Johnson Test of Achievement which measured Plaintiff's ability in reading and mathematics. (Tr. 222-23). Plaintiff's performance, relative to his peers, was as follows: (1) 16th percentile in Letter Word Identification; (2) 5th percentile in Passage Comprehension; (3) 17th percentile in Math Calculations; and (4) 25th percentile in Applied Problems. (Tr. 223). The examiner also observed the following:

> In reading, Austin experienced little difficulty with the basic sight words and read them with confidence. As the test progressed, he attempted to sound out most of the more difficult words. His phonics skills were such that their application to the more complicated words was insufficient. He experienced more difficulty with comprehension on the second subtest when the passages became lengthy. He appeared to read the passages quickly and toward the end of the test indicated that he couldn't give an answer.
>
> In math, Austin worked steadily on calculation problems. He was able to solve problems involving simple addition, subtraction, multiplication and division. When asked to solve problems that were read to him, he did not take the time to set them up on paper. He was able to successfully solve problems dealing with basic time, money and measurement concepts. At the end of the test he volunteered answers very quickly or not at all, indicating that the problems were too difficult or confusing for him.

(Tr. 223).

The examiner further noted:

> Austin was cooperative during the testing session and this is felt to be an accurate indication of his skills at this time. Austin indicated that he is doing well in school and is passing all of his classes. He has the most difficulty with his Biology class. He finds the reading to be confusing and complicated. His favorite classes are his Woods and Metals classes. He likes to work on projects which involve using his hands. He likes sports and plays football. He also works with his grandfather occasionally, helping with odd jobs in his neighborhood.

(Tr. 222).

Dr. Decker concluded that "Austin's scores do not meet the eligibility requirements for services under the category of learning disability." (Tr. 221).

Treatment notes dated April 3, 2008, indicate that Plaintiff was participating in a "sports physical" because "he will be participating in track and shot put." (Tr. 212).

On April 16, 2009, Plaintiff was evaluated by Dr. Decker. (Tr. 229-30). The doctor concluded as follows:

> Austin's score in reading comprehension is consistent with his ability level. Although basic reading remains an area of weakness for Austin, his score does not demonstrate sufficient discrepancy between his/her ability and current academic functioning to qualify for assistance in this area.
>
> Austin's scores do not meet the eligibility requirements for special education under the category of Specific Learning Disability. A school social work evaluation is also part of the current referral and will address Austin's continuing eligibility under EI. An IEP will review all results and determine final eligibility.

(Tr. 229).

In April 2009, Social Worker Kathryn Sanchez completed a "work evaluation summary" to assess whether Plaintiff "continues to qualify for special education services as a student with an Emotional Impairment." (Tr. 232-36). With respect to Plaintiff's academic performance, Sanchez observed:

> Austin attends LCC in the morning as part of the Heating and Air Conditioning Program and is doing well. He has three classes at the high school starting with third hour. He has a B+ in Math, credit in Personal Conditioning but an E in English with three missing assignments.

(Tr. 236).

With respect to her interview of Plaintiff, Sanchez reported as follows:

> Austin came willingly to the interview and easily established rapport. He stated that he lives with both his parents and two older brothers. He said that he gets along with his parents and oldest brother Randy but has more conflicts with his brother Josh who is twenty two. He shared that both he and Josh have had some involvement with the law and have both been on probation which ended last fall for Austin. Since then, he has made an effort to stay out of trouble, which has resulted in the loss of several people he had considered friends. He still has friends he sees mostly at school. Austin indicated that he likes LCC and plans to continue next fall in the Heating & Air Conditioning Program although he is concerned about how he will travel to Lansing since he doesn't have a driver's license. He admitted that in the past, he had more trouble at school and could be off task or disruptive to other students.
>
> He said that he doesn't need to take frequent breaks or walk in the hall now because he is better able to control his temper and remain focused. He said that he used to take medication for ADHD and depression but he didn't like the "weird" feeling it gave him and his doctor agreed he could try going off the medication. He said that he participated in counseling for the year he was on probation and that he learned strategies to calm down and refocus. They include ta[]king a walk, count from one to ten, hold his breath, or think about something else. He said that he feels his behavior at school is better because he got sick of getting into trouble and is more grown up now.

> He said that going through the requirements of probation helped him realize what he wants out of life and he is proud that he is accomplishing his goal of graduating with his class and moving on to LCC. When asked about feelings, Austin responded that it makes him mad when teachers at school "do too much talking" about an assignment instead of letting students get started on the task. He shared that he has a good relationship with Mr. Erik Smith and although it can annoy him when Mr. Smith "gets after me," he realized that it is because Mr. Smith knows he can do better with his behavior and expects more of him now. It makes him feel happy when he can be outside and take a walk in nature and it makes him feel sad that it seems like his parents like Josh more than him. He shared that he feels he is working hard in school and making an effort to improve his behavior and doesn't get as much recognition as Josh who has not finished high school, is unemployed and still on probation. Austin's biggest concern is passing his English class but he is working on that with Mr. Smith. Austin presented as a thoughtful young man who has reflected on past mistakes and developed and followed a plan to make better choices for the future. He is proud of the changes he has made and confident that if he has some support, he will be able to be successful at LCC and finding employment.

(Tr. 234-35).

Sanchez also observed Plaintiff on two occasions in classroom settings. (Tr. 233). With respect to these observations, Sanchez reported as follows:

> 3/23/09 - classroom
> Austin entered his third hour Math class about ten minutes after class began since he was arriving from LCC. He greeted both of the teachers who co-teach the class in a friendly manner and settled in his seat. He conversed briefly with two students seated near him but was also attentive to the teacher as he went over a recent quiz. He lets the teacher know that he has a pen but no pencil and is encouraged to ask another student to borrow one which he does and then sharpens. The teacher asks him to read a particular problem and go through the steps which he does easily and correctly. When one of the teachers leaves the room momentarily, he directs a comment about MSU basketball to Austin who smiles and responds appropriately. After several minutes, one of the teachers is explaining a new concept. Austin has his calculator out and seems to be working on the problem as

> directed. He appears to be engaged but somewhat distracted at times by the social aspect of class. When there is a break in the teaching, Austin talked to those around him. He then continued taking notes but laughs at some of the teacher's comments. At times, the teacher prompts him to pay attention. Austin generally responded to these reminders cooperatively but with a slight air of irritation. After several minutes, the teacher asked him, "Austin, do you have this down?" Austin answered, "I'm ahead of you, I've already solved it." In a few minutes, the teacher called on him and he gave the correct answer. He then continued to work on the problems along with the rest of the class.
>
> 3/30/2009 - classroom
> Austin was on time for his English class and seated in the back. One of the teachers co-teaching this class handed out a sheet on what assignments students were missing. When Austin looked over his sheet, he exclaimed, "I'm missing a lot man!" He then exchanged comments with several boys seated near him. When students were instructed to prepare for class, Austin dug through his backpack for a pencil and his book. The teacher handed out a study guide for Julius Caesar and turns out the lights for students who are making up a quiz on the overhead. Austin exclaimed, "Holy Crap!" and the teacher came over to direct him on how to do the questions. The teacher reminded everyone to be quiet since some students are doing the quiz and Austin said, "It's not my fault they weren't here for the quiz." The teacher reminded him to stop talking and be quiet. Several students were asking each other where to find the answers on the study guide. During the next ten minutes, Austin talked, joked and laughed with a group of four boys seated near him while he looked through a dictionary for definitions. When the teacher signaled him to be quiet, he said, "You missed it. If you would have heard it, you'd be laughing too." The teacher came back to his seat to redirect him which he accepted in a good natured manner. Austin seemed to have an overwhelming need to talk or engage other students in conversation. He told stories and could seem off task. When students were asked to open their books to Act II, some were assigned parts to read aloud to the class, Austin seemed to be restless and looked around at other students although he did appear to be paying attention on and off to the study guide and to the students who were speaking.

(Tr. 233).

Sanchez also elicited input from two of Plaintiff's teachers who reported the following:

> Mr. Smith, who has had Austin in several different classes for more than two years, indicated that, "Austin often has a great attitude in class, but out of nowhere appears frustrated or angry and has trouble reining it in. His work habits are not that great unless it is something he is honestly interested in. Austin is doing great at LCC for HVAC. He has no problems there, but sometimes at school, he lets his emotions get the best of him."
>
> Mr. Ribby, who has Austin in his Personal Conditioning class added, "Austin's attitude in class is great, no problems. He works very hard and gets along with his peers."

(Tr. 232).

Sanchez concluded her evaluation as follows:

> A Multidisciplinary Evaluation Team and Individualized Education Program Team will be convened to review the evaluation results and if necessary, plan an educational program that will meet Austin's needs. Although it is clear that Austin has made great progress in improving his behavior in school and passing his classes, there are still concerns about how his feelings of anger and frustration can interfere with his academic success. Although Austin uses techniques to deal with his depression and ADHD and these are helpful to him, he can still struggle with focusing on the negative and distracting himself or others in class. It is the recommendation of the school social worker that Austin continue to qualify for services as a student with an Emotional Impairment[,] a general, pervasive mood of unhappiness or depression. Austin's depression may present itself as anger, irritation, isolation and hopelessness. Austin may benefit from supportive services as he transitions from high school to college.

(Tr. 232).

On September 19, 2009, Lisa Clark completed a report regarding Plaintiff's activities. (Tr. 159-66). Clark reported that Plaintiff watches television, plays video games, prepares meals, performs chores around the house and yard, and shops. (Tr. 159-66).

9

On October 26, 2009, Plaintiff participated in a consultive examination conducted by J. Keith Ostien, Ph.D. (Tr. 258-62). Plaintiff participated in cognitive testing the results of which revealed that he possessed a verbal IQ of 74, a performance IQ of 68, and a full scale IQ of 69. (Tr. 259). Plaintiff also participated in the Wide Range Achievement Test - 4 the results of which revealed that he has "borderline academic skills in reading and spelling, and diminished skills in arithmetic." (Tr. 260). The doctor further noted, however, that during this evaluation Plaintiff was experiencing a significant amount of "emotional distress" which "influenced his focus and concentration." (Tr. 259). The doctor concluded that "it is not known to what extent his emotional distress may have adversely affected his performances on the standardized tests." (Tr. 259). The results of a mental status examination revealed the following:

> Austin exhibited evidence of severe levels of depression, hopelessness, and despair. His mother indicated that he has had emotional problems since he was around five. Austin traced his intense emotional distress to the age of 13 or 14 when his uncle died. Austin stated that he was in Special Education because of emotional problems. It would appear that Austin has a long history of depression, social withdrawal and isolation, and social avoidance. His responses to the Beck Depression Inventory showed evidence of severe levels of depression characterized by persistent depressed mood, severe sadness, despair about the future, feelings of being a failure, a reduced capacity to experience pleasure or happiness, intense feelings of guilt, feelings of being punished, self-loathing, persistent suicidal ideation, increased emotional reactivity, reduced interest in the external world, difficulty being able to make decisions, sleep disturbance, fatigue and lethargy, loss of appetite, and intense social discomfort and social avoidance.

(Tr. 261).

Plaintiff was diagnosed with: (1) major depressive disorder, recurrent, severe; (2) attention deficit hyperactivity disorder, inattentive type; (3) avoidant personality disorder; and (4)

borderline intellectual functioning. (Tr. 262). The doctor concluded that Plaintiff "probably would have difficulty in job settings in which more complex academic skills were required," but could function "in vocational settings in which very basic academic skills were utilized." (Tr. 260).

School progress notes dated November 13, 2009, state that "Austin struggled with HVAC early, a class he was placed in because auto body was full, but recently has been an exemplary student." (Tr. 244). School progress notes dated March 2, 2009, indicate "Austin continues to excel in his HVAC course" and "is on track to receive some college credit for his success." (Tr. 244).

## ANALYSIS OF THE ALJ'S DECISION

Under the Social Security Act (the Act) there exist two separate and distinct programs pursuant to which a disabled individual may obtain benefits. Title II of the Act creates the Disability Insurance Benefit (DIB) program whereas Title XVI of the Act creates the Supplemental Security Income (SSI) program. To be eligible for DIB, a claimant must be "insured for disability insurance benefits," and establish that he became disabled prior to the expiration of his insured status. *See, e.g., Tillackdharry v. Barnhart*, 2006 WL 903191 at *4 (S.D.N.Y., April 10, 2006) (citing 42 U.S.C. § 423). A claimant's "insured status" is calculated using a system of "quarters of coverage" ("QC"), with each quarter defined as three calendar months. *See Tillackdharry*, 2006 WL 903191 at *4 (citing 42 U.S.C. § 423(c)(1)(B) and 20 C.F.R. § 404.102). A claimant is credited with quarters of coverage based on wages or self-employment income earned during the calendar years he has worked. *See Tillackdharry*, 2006 WL 903191 at *4 (citing 20 C.F.R. § 404.130). To be eligible for DIB benefits, a claimant must have accumulated at least 20 quarters of coverage during the 40

quarter (ten year) period ending with the quarter in which benefits are sought. *See Tillackdharry*, 2006 WL 903191 at *4 (citing 20 C.F.R. § 404.130(b)). On the other hand, eligibility for SSI benefits considers a claimant's financial need and his income may not exceed specified dollar amounts. *See Tillackdharry*, 2006 WL 903191 at *4 (citing 42 U.S.C. § 1382(a)).

As noted above, Plaintiff applied for benefits under both Title II and Title XVI. Because of his age and work history, Plaintiff does not qualify for traditional Title II benefits. Plaintiff instead filed for Child's Benefits under Title II pursuant to which eligibility is based upon the earnings record of an eligible parent. *See* 20 C.F.R. § 404.350(a). Plaintiff is entitled to child's benefits if he is "18 years or older and ha[s] a disability that began before [he] became 22 years old." 20 C.F.R. § 404.350(a).

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[1] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional

---

[1] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

impairment as well as an exertional impairment, both are considered in determining her residual functional capacity.  See 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy.  See 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.  While the burden of proof shifts to the Commissioner at step five of the sequential evaluation process, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined.  See *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffers from: (1) major depressive disorder; (2) attention deficit hyperactivity disorder; (3) avoidant personality disorder; and (4) borderline intellectual functioning, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 25-27).  The ALJ next determined that Plaintiff retained the capacity to perform work at all exertional levels subject to the following limitations: (1) he is limited to simple routine tasks; (2) he can perform work with superficial and incidental interaction with co-workers, supervisors, and the public, but should avoid work where he would have to complete tasks in tandem with others or as part of a team.  (Tr. 27).

The ALJ found that Plaintiff had no past relevant work at which point the burden of

proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here as the ALJ questioned a vocational expert.

The vocational expert asserted that there existed in the state of Michigan at least 47,000 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 57-58). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). The ALJ concluded, therefore, that Plaintiff was not entitled to disability benefits.

In his appeal, Plaintiff asserts that the ALJ improperly rejected the opinions of one of his treating physicians. (Dkt. #17 at 13-14). Plaintiff, who is represented by counsel, has also asserted the nebulous claim that "the ALJ's decision is not supported by substantial evidence." (Dkt. #17 at 11-13). While this argument is quite poorly developed, it appears that Plaintiff is arguing that he satisfies the requirements of a Listed Impairment, specifically Listing 12.05C. This determination

is based on the fact that the only authority cited by Plaintiff in this portion of his brief is Listing 12.00 and, furthermore, by the fact that Plaintiff elsewhere in his brief argues that he satisfies "the first prong of the criteria for Listing 12.05C." (Dkt. #17 at 7, 11-13).

I.      **Plaintiff Does Not Meet a Listed Impairment**

Section 12.05 of the Listing provides, in relevant part, the following:

12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A.   Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

OR

B.   A valid verbal, performance, or full scale IQ of 59 or less;

OR

C.   A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function;

OR

D.   A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

      1.      Marked restriction of activities of daily living; or

      2.      Marked difficulties in maintaining social functioning; or

      3.      Marked difficulties in maintaining concentration, persistence or pace; or

      4.      Repeated episodes of decompensation, each of extended duration.

20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.05.

Plaintiff argues that he satisfies sections 12.05(C). Testing performed in October 2009 revealed that Plaintiff possessed a verbal IQ of 74, a performance IQ of 68, and a full scale IQ of 69. As noted above, however, the validity of these results was called into question by the examiner. Previous cognitive testing revealed that Plaintiff possessed a verbal IQ of 84, a performance IQ of 82, and a full scale IQ of 82. In addition to finding that Plaintiff suffers from borderline intellectual functioning, the ALJ also found that Plaintiff suffers from emotional impairments which impose "additional and significant work-related" limitations.

Even if the Court assumes that Plaintiff satisfies the criteria articulated in subsection (C) (e.g., scores between 60-70 on an IQ test), Plaintiff must also satisfy the requirements articulated in the introductory paragraph of Section 12.05. 20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.00(A) ("[i]f your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets" section 12.05). Specifically, Plaintiff must establish that he satisfied the "diagnostic description" of mental retardation articulated in the introductory paragraph of Section 12.05. *Cooper v. Commissioner of Social Security*, 217 Fed. Appx. 450, 451 (6th Cir., Feb. 15, 2007); *see also*, *Foster v. Halter*, 279

F.3d 348, 355 (6th Cir. 2001) (to satisfy Section 12.05, the claimant must demonstrate that he experienced deficiencies in adaptive functioning prior to attaining the age of 22).

While the record suggests that Plaintiff, when he was younger, experienced certain emotional difficulties, the record also reveals that Plaintiff's difficulties in this regard lessened over time. Moreover, the record does not indicate that Plaintiff's emotional difficulties were ever of Listing level severity. In short, the record does not support the argument that Plaintiff experienced deficiencies in adaptive behavior or suffered from mental retardation prior to the age of 22 or at anytime after age 22.

Neither Plaintiff's care providers nor any of the medical professionals who examined the record in this case concluded that Plaintiff was mentally retarded or satisfied the "diagnostic description" of mental retardation articulated in the introductory paragraph of Section 12.05. Instead, as the ALJ concluded, Plaintiff appears to experience borderline intellectual functioning. As the Sixth Circuit has observed, a diagnosis of borderline intellectual functioning is inconsistent with a diagnosis of mental retardation and, therefore, precludes a finding that the requirements of Section 12.05 have been met. *See Cooper*, 217 Fed. Appx. at 451.

Plaintiff's reported activities (e.g., playing sports, taking college level courses, watching television, playing video games, performing household chores, and shopping) likewise fail to support the argument that he suffers from mental retardation. *See, e.g., Burrell v. Comm. of Soc. Sec.*, 2000 WL 1827799 at *2 (6th Cir., Dec. 8, 2000) (no evidence of a deficit in adaptive functioning where claimant "remained fairly active, maintains an interest in his household, and enjoys apparent satisfactory relationships with family members").

The burden rests with Plaintiff to demonstrate that he satisfies the requirements of a listed impairment. *See Kirby v. Comm'r of Soc. Sec.*, 2002 WL 1315617 at *1 (6th Cir., June 14, 2002). The ALJ evaluated the evidence of record and determined that Plaintiff failed to meet his burden in this regard. The ALJ's decision is supported by substantial evidence.

II.         **The ALJ's Assessment of the Medical Opinions is Supported by Substantial Evidence**

Plaintiff next asserts that he is entitled to relief because "the ALJ rejected all of Dr. Ostein's opinion as to [Plaintiff's] limitations." (Dkt. #17 at 13). Specifically, Plaintiff asserts that the ALJ failed to afford sufficient weight to Dr. Ostein's conclusions that Plaintiff "would have severely impaired capabilities to interact appropriately and effectively with co-workers and supervisors and to adapt to changes in a work setting." (Dkt. #17 at 13-14).

First, because Dr. Ostein examined Plaintiff on only one occasion his opinions are not entitled to any particular deference. *See, e.g.*, *Kornecky v. Commissioner of Social Security*, 167 Fed. Appx. 496, 506-07 (6th Cir. 2006). Second, the doctor's opinion that Plaintiff's ability to interact with co-workers and supervisors and to adapt to changes in a work setting is "severely impaired" is insufficiently vague. The ALJ likewise recognized that Plaintiff experienced limitations in these areas and crafted his RFC accordingly. The ALJ's RFC assessment is supported by substantial evidence and it is not clear from the record that Dr. Ostein's opinion is inconsistent with the ALJ's RFC determination. Finally, the ALJ considered Dr. Ostein's findings and discounted such on the ground that they were inconsistent with Plaintiff's reported activities and treatment

history, a determination likewise supported by substantial evidence. In sum, the ALJ's assessment and evaluation of Dr. Ostein's opinion is supported by substantial evidence.

### **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: September 23, 2014                 /s/ Ellen S. Carmody
                                         ELLEN S. CARMODY
                                         United States Magistrate Judge